**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Josan Wolf PATINO,
Defendant-Appellant.**

No. 87–1227.

United States Court of Appeals,
Seventh Circuit.

Argued June 1, 1987.

Decided Sept. 10, 1987.

Alan G. Habermehl, Kalal & Habermehl, Madison, Wis., for defendant-appellant.

Grant C. Johnson, Asst. U.S. Atty., and John R. Byrnes, U.S. Atty., Madison, Wis., for plaintiff-appellee.

Before CUMMINGS, and CUDAHY, Circuit Judges, and GRANT, Senior District Judge.[*]

CUMMINGS, Circuit Judge.

Early on the morning of August 14, 1986, Federal Bureau of Investigation agents in Chicago learned that William F. Richard ("Richard") had been positively identified by a witness as the perpetrator of the June 26, 1986, armed robbery of a Wisconsin savings and loan association. The investigators also learned that a neighbor of defendant Josan Wolf Patino ("Patino") had been shown a photograph of Richard and identified him as the person who stayed at Patino's Chicago apartment from time to time and drove an orange pickup truck. These reports confirmed information received eight days earlier on August 6 from a prison inmate, who had furnished reliable information in the past. This inmate had conversed over the telephone with Patino, and the call was recorded. She had told him that she and Richard were involved in a number of armed robberies, including the robbery of a convenience store where a security guard was shot, that Richard was going to stay at her home beginning August 7, and that they would commit one more robbery and then he would leave Chicago. At 9:30 a.m. an agent drove through the neighborhood where Patino lived but he saw neither Richard nor the orange truck.

Later, acting only on the basis of a United States Attorney's "verbal authorization" to arrest Richard,[1] six FBI agents drove in three cars to Patino's home to arrest Richard. They did not seek a search warrant to enter Patino's apartment-house to search for Richard, as required by *Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38. They arrived between 11:20 and 11:30 a.m., but upon not observing Richard or his orange truck they went to lunch and left no one to watch the apartment-house for signs of Richard.

Returning from lunch at about 1:00 p.m., one of the agents drove past Patino's home and saw Richard out front helping another man unload furniture from a van. The agent radioed for backup assistance and three of the agents who had joined him for lunch but were now thirty minutes away responded. The agent did not request a telephone search warrant.

Around 1:40 p.m., the four FBI agents assembled and two agents entered Patino's apartment from the front, with guns drawn, as two agents guarded the rear. Defendant Patino was walking toward the door as the agents entered. One agent pointed a shotgun at her, identified himself as an FBI agent, and asked where Richard was. He repeated the question and Patino pointed over her shoulder towards the bedroom. The agent drew Patino along to keep her in view while the second agent entered the bedroom and arrested Richard. Both Patino and Richard were handcuffed. No weapons of any kind were found in the apartment.

Two agents then took Patino into the bathroom to ask her, out of Richard's presence, to cooperate. They removed her handcuffs and said that they could prove she was involved in four bank robberies and a convenience store robbery. Patino asked to make a "deal," but they told her she was in no position to deal. She agreed to cooperate; Richard was led away by two of the agents to be booked. The remaining two agents read Patino her rights. She indicated she understood them and signed a waiver form at 1:59 p.m. The agents took her statement over a two and a half hour period. Twice Patino left her apartment accompanied by an FBI agent—once to search for her dog and once to take the dog

---

[*] The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

**1.** An agent in Wisconsin told an agent in Chicago that he was going to seek an arrest warrant for Richard. The Chicago agents did not learn of the issuance of the warrant prior to arresting Richard and thus the magistrate properly treated the arrest as warrantless. (Defendant's App. 18–19.)

for a walk—but the agents had told her that they would leave if she asked them to do so, and the atmosphere was cordial.

On the next day, August 15, Patino called one agent to tell her that Richard's mother had called and made some vaguely threatening remarks. Patino told the agent that Richard's gun was stored at his brother's house. On August 20, six days after the search of her residence, Chicago Police Department detectives called Patino and arranged for police officers to pick her up and drive her to their station. At the station, she was again advised of her rights and repeated the substance of her August 14 statement.

Patino was indicted on counts of armed bank robbery (18 U.S.C. § 2113(a) and (d)). She moved to suppress the two confessions on the basis that they were fruits of an unconstitutional warrantless search of her home. Magistrate Groh recommended denying her motion to suppress, and Judge Crabb adopted his recommendation. Patino subsequently entered a guilty plea to two reduced charges of bank theft (18 U.S.C. § 2113(b)) on the condition that her motion to suppress the confessions be preserved for appellate review. This appeal followed.

■ The initial question, the constitutionality of the warrantless search of Patino's home for Richard, calls for a straightforward answer because the law is clear. In *Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38, the Supreme Court held that absent exigent circumstances or consent, a search warrant is required to enter and search a third person's home for a fugitive named in an arrest warrant. In that case the police, armed with only an arrest warrant naming the fugitive and their own personal determination of probable cause to believe he would be there, searched a third person's home identified by a confidential informant as the fugitive's possible location. The Court held that while an arrest warrant authorizes police officers to seize a suspect in a public place or in his home, it does not authorize them to enter the home of a third person where they believe the suspect may

be staying. Because the arrest warrant does not protect the third person's "privacy interest in being free from an unreasonable invasion and search of his home," *id.* at 213, 101 S.Ct. at 1648, a search of a third person's home based solely on such a warrant is unconstitutional, *id.* at 212–216, 101 S.Ct. at 1647–50. See *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (holding warrantless arrest in fugitive's own home unconstitutional absent probable cause and exigent circumstances, but that an arrest warrant founded on probable cause allows entry into the named person's home for the limited purpose of effecting the arrest).

The parties agree that this search can only be justified by an appeal to exigent circumstances. No claim is made that Patino consented to the search. The agents did not have (nor did they ever seek) a search warrant to search Patino's home for Richard. They also did not have an arrest warrant naming Patino, which would have given them under *Payton* "the limited authority" to enter her house to arrest her, and therefore they cannot justify the search on that basis. In fact, they did not even possess an arrest warrant naming Richard—one was issued prior to the search of Patino's home but they did not know that it was issued. See *supra* note 1. Of course, the presence of an arrest warrant naming Richard would not alter the constitutionality of the entry of Patino's house without a search warrant because *Steagald* holds that would be insufficient vis à vis Patino.

As an exception to the Fourth Amendment's warrant requirement, the burden is on the government to show that the warrantless entry is justified by exigent circumstances, and "an objective standard governs the reasonableness of law enforcement officials' belief that exigent circumstances have arisen." *United States v. Dowell*, 724 F.2d 599, 602 (7th Cir.1984), certiorari denied, 466 U.S. 906, 104 S.Ct. 1683, 80 L.Ed.2d 157, and 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367. The government's claim of exigent circumstances here was premised on the fact that there

was a "clear showing of probable cause," *viz.*, prior to the day of the search, the agents had learned from a reliable informant that Richard had robbed a number of insured financial institutions, a manager of one institution had positively identified him as the perpetrator, he was suspected of committing violent crimes, and he was thought to be planning one more armed robbery before fleeing the Chicago area. No doubt these circumstances required quick and decisive action by the FBI agents; yet the resiliency of the Fourth Amendment's warrant requirement is precisely because it is compatible with effective law enforcement. See *Steagald*, 451 U.S. at 221–22, 101 S.Ct. at 1652–53. We do not quarrel with the district judge's conclusion that immediate action was required, but for purposes of ascertaining the existence of exigent circumstances there is more to this story than just the assembly of the four agents at Patino's apartment-house at 1:40 p.m. As we have previously held: "[W]hen the emergency justification is advanced, we believe it is appropriate to appraise the agents' conduct during the entire period after they had a right to obtain a warrant and not merely from the moment when they knocked at the front door." *United States v. Rosselli*, 506 F.2d 627, 630 (7th Cir.1974) (footnote omitted) (Stevens, J.).

One fact alone demonstrates the lack of exigent circumstances and the consequent unreasonableness of the entry of Patino's residence without a search warrant. An agent returning alone after the lunch observed Richard outside Patino's apartment-house at about 1:00 p.m., and he called for backup assistance to make the arrest because he thought that Richard might be armed. The magistrate found that these agents were at the time thirty minutes away. The agent at the scene waited for reinforcements before making any attempt to enter Patino's home in search of Richard. Inexplicably, during that thirty-minute period he did not attempt to arrange for a telephonic search warrant despite the provision for such warrants in Federal Rule of Criminal Procedure 41(c)(2). Five years earlier the Supreme Court recognized

in *Steagald* that the availability of telephonic search warrants minimized the burdens of *Steagald's* requirement of a search warrant to enter a third person's house to seize a fugitive. 451 U.S. at 222, 101 S.Ct. at 1652. A telephonic search warrant should have been sought during the thirty-minute period the agent awaited the other officers.

We recently held in *United States v. Diaz*, 814 F.2d 454 (7th Cir.1987), that because the defendant drug dealer had indicated he would wait in his hotel room for about thirty minutes for the undercover agent to return with the cash and there was no indication he suspected that he was being set up, there was no emergency justifying a warrantless search. *Id.* at 456, 458–459. We noted that under these facts, seeking a telephonic search warrant would have been an appropriate course of action. *Id.* at 457. By comparison, although the agent had no information regarding the length of time Richard was going to remain at Patino's home, the search was going to have to wait because the backup agents were not present. Just as there was no emergency in *Diaz* justifying the warrantless search, so too there was no emergency here. Furthermore, if the telephonic warrant process had taken longer than the thirty minutes or so it took the backup agents to arrive, since there was no indication that Richard suspected that he had been found, the four agents could have discreetly watched the exits while they awaited the telephonic search warrant. In fact, when two of the four agents made their warrantless entry via the front door of Patino's home, only two remained to guard the rear of the building against a possible escape attempt, suggesting that four agents could have watched the apartment-house during the completion of the telephonic warrant process. A telephonic search warrant could have been obtained without hindering the apprehension of Richard, and it follows that exigent circumstances justifying a warrantless entry were not present.

The adequate opportunity of the agent to obtain a telephonic search warrant during

the wait for backup assistance is not the only ground for holding that exigent circumstances were not present. An independent basis for finding exigent circumstances lacking is that the agents could have sought a search warrant on the morning of August 14, prior to the sighting of Richard outside of Patino's home at 1:00 p.m. About four hours before the actual search, the agents had probable cause to believe that Richard committed at least one armed robbery and had probable cause to believe he would be staying at Patino's home. A reliable informant had given an agent this information, and its accuracy was confirmed by the manager of one of the robbed institutions identifying Richard's picture in a photographic lineup and by a neighbor of Patino recognizing Richard as a person who stayed from time to time at Patino's home. All of this information was assembled around 9:30 a.m. on the day of the search. The government sought no search warrant and yet thought the information reliable enough to send six agents to Patino's home about 11:20 a.m. Furthermore, the claim of exigent circumstances rings hollow when one considers that although the government maintains that there were great fears Richard would show up at Patino's home and then slip away to commit another armed robbery, all six agents went to lunch together leaving the house unguarded for over an hour.

Here the police had ample opportunity to seek a search warrant, and if there were any exigent circumstances in this case, they were created by the failure of the police to make use of this opportunity. We have previously stated that "law enforcement officials may not deliberately wait for exigent circumstances to arise and then exploit the exception to justify warrantless entry." *Dowell*, 724 F.2d at 602. Instead, the Fourth Amendment requires a warrant in the general run of searches, with the exceptions labeled "exigent circumstances" being " 'few in number and carefully delineated.' " *Welsh v. Wisconsin*, 466 U.S. 740, 749, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (quoting *United States v. United States District Court*, 407 U.S. 297, 318, 92 S.Ct. 2125, 2137, 32 L.Ed.2d 752); *Diaz*, 814

F.2d at 458. This warrant requirement is "an important working part of our machinery of government, operating as a matter of course to check the 'well-intentioned but mistakenly over-zealous executive officers' who are a part of any system of law enforcement." *Coolidge v. New Hampshire*, 403 U.S. 443, 481, 91 S.Ct. 2022, 2046, 29 L.Ed.2d 564 (quoting *Gouled v. United States*, 255 U.S. 298, 304, 41 S.Ct. 261, 263, 65 L.Ed. 647. In fact, the Court has stated in a case involving this very factual setting that "the participation of a detached magistrate in the probable-cause determination is an essential element of a reasonable search or seizure." *Steagald*, 451 U.S. at 216, 101 S.Ct. at 1649. To allow resort to "exigent circumstances" when there is time to obtain a warrant defeats this important constitutional safeguard against unreasonable searches and seizures. *Id.* at 215–216, 101 S.Ct. at 1649; see *Rosselli*, 506 F.2d at 630. The doctrine of "exigent circumstances" assumes that it is not practicable to obtain a warrant; and that was not the case here.

Exigent circumstances are not irretrievably lost when officers forego their opportunity to obtain a search warrant; new or unforeseen circumstances may arise and create adequate exigent circumstances for a warrantless search. Absent that turn of events, however, the failure to obtain a warrant is relevant to determining whether the officers' actions were reasonable. In *Rosselli* we held that one factor in determining the reasonableness of the search (and hence its constitutionality) was the "government's opportunity to anticipate and avoid the need to rely on an emergency justification." 506 F.2d at 631. When one considers the ample opportunity the agents here had to obtain a search warrant, their deliberate decision to attempt to apprehend Richard at Patino's home, their actions of leaving the house unguarded so as to have lunch together, suggesting that they did not perceive a great emergency, their ability to guard the house against escape while a warrant was being sought, and the fact that there was no indication Richard suspected he had been found, the conclusion

that this warrantless search was unreasonable is unavoidable.

At oral argument the government counsel stated that no attempt was made to obtain a search warrant because the agents did not think it was necessary. *Steagald* had clearly declared otherwise five years earlier, and the agents' unreasonable belief to the contrary cannot vindicate this constitutional violation.

■ Because the search of Patino's home violated the Fourth Amendment, the next question is whether Patino's confessions must be excluded as fruits of the unconstitutional search. The burden of proving admissibility of a confession that follows from a Fourth Amendment violation rests with the prosecution. *Taylor v. Alabama,* 457 U.S. 687, 690, 102 S.Ct. 2664, 2667, 73 L.Ed.2d 314; *Brown v. Illinois,* 422 U.S. 590, 604, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416. The fact that a *Miranda* warning was given and understood is not conclusive and "a finding of 'voluntariness' for purposes of the Fifth Amendment is merely a threshold requirement for Fourth Amendment analysis." *Taylor,* 457 U.S. at 690, 102 S.Ct. at 2667. Other relevant factors to consider are "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, ... and, particularly, the purpose and flagrancy of the official misconduct." *Brown,* 422 U.S. at 603–04, 95 S.Ct. at 2261–62 (footnotes omitted).

In the present case, the magistrate did not reach the fruit-of-the-poisonous-tree question due to his erroneous conclusion that there was no Fourth Amendment violation. Patino argued below, though not on appeal, that the confessions violated the Fifth and Sixth Amendments. In ruling on those claims, the magistrate determined that Patino was informed of her *Miranda* rights, understood them, and voluntarily

confessed. Patino does not challenge these determinations and the threshold requirement for admissibility is established here.

■ An examination of the other factors bearing on admissibility compels the conclusion that Patino's first confession must be excluded. This confession was temporally proximate to the unconstitutional search; for she signed a waiver of her rights and began the confession within twenty minutes of the unconstitutional conduct. That the confession took over two hours to complete does not diminish the temporal proximity: the Supreme Court has held confessions temporally proximate that have occurred two hours after the violation, *Dunaway v. New York,* 442 U.S. 200, 218, 99 S.Ct. 2248, 2259, 60 L.Ed.2d 824; *Brown,* 422 U.S. at 604, 95 S.Ct. at 2262, and even six hours following the violation, *Taylor,* 457 U.S. at 691, 102 S.Ct. at 2667. The fact that Patino twice left her home—once to look for her dog and once to walk her dog—is not sufficient to purge the effect of the illegal entry and search because she was always in the "company" of at least one agent. Even if Patino did not remain in "custody," as the magistrate believed,[2] she could not leave her home and be outside the presence of the government agents during this two-hour period and consequently there was no significant break from the initial unconstitutional entry and search. Finally, the entry was not peaceful—Patino was greeted and held at bay with a shotgun wielded by agents who had surreptitiously (and unconstitutionally) entered her home—and the violation had "a quality of purposefulness." *Brown,* 422 U.S. at 605, 95 S.Ct. at 2262. As shown, the agents had ample opportunity to obtain a search warrant and yet inexplicably decided not to do so.

The government does not address the fruit-of-the-poisonous-tree issue, despite

---

**2.** In analyzing the *Miranda* claim, the magistrate found that Patino was not in "custody" because the agents said they would leave at any time Patino requested them to do so (Defendant's App. 28–29). However, Patino could not depart from the presence of the agents because an agent insisted on accompanying her when she twice left the house. The agents feared that she might obtain a weapon. We need not rule on the correctness of the magistrate's legal conclusion because Patino did not appeal from the denial of her *Miranda* claim. For purposes of the Fourth Amendment "fruits" doctrine, the obvious restrictions on Patino's movement continued the taint from the illegal entry and search.

the fact it has the burden on this issue. In addressing the issue of whether the agents exceeded the permissible scope of the warrantless search by remaining in Patino's home, the government does argue that Patino consented to the agents remaining there for two hours or so and, in fact, served them lemonade (Government's Br. 16–17). However, given the intimidating display of illegal force, Patino's conduct does not alleviate the continuing taint because her submissive reactions could well have been triggered by the Fourth Amendment violation. See *Wong Sun v. United States*, 371 U.S. 471, 486 and n. 12, 83 S.Ct. 407, 416 and n. 12, 9 L.Ed.2d 441. The government has failed to carry its burden of showing "a sufficient break in events to undermine the inference that the confession was caused by the Fourth Amendment violation," *Oregon v. Elstad*, 470 U.S. 298, 306, 105 S.Ct. 1285, 1292, 84 L.Ed.2d 222, and the first confession therefore must be suppressed.

The second confession, made six days after the unconstitutional entry and search, poses a more difficult question. Patino was not arrested on August 14 and she was allowed to move freely about for six days. Given this temporal distance and the time outside of the presence of government agents, the second confession not only would satisfy the threshold requirement of voluntariness under the Fifth Amendment but also might be "sufficiently an act of free will to purge the primary taint of the unlawful invasion," *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441. (footnote omitted); see *Brown*, 422 U.S. at 602, 95 S.Ct. at 2261. In *Wong Sun*, the Court held that defendant Wong Sun's confession was not fruit of the illegal arrest because it was made six days after the illegal arrest and during this period he had been free on his own recognizance and voluntarily returned to the police station to make a statement. 371 U.S. at 476 and n. 4, 491, 83 S.Ct. at 411 and n. 4, 419. As for defendant Toy, however, the Court did not decide if his confession made six days after the illegal arrest and while he was free on his own recognizance was inadmissible as fruit of the poisonous tree

because the Court found it inadmissible on other grounds. *Id.* at 488, 83 S.Ct. at 417. Significantly, Toy, like Patino but unlike Wong Sun, made an earlier confession at the time of the illegal entry and arrest and that statement was suppressed. *Id.* at 486, 83 S.Ct. at 416.

In two later cases where defendants made two confessions, the Court suppressed both as fruit of the Fourth Amendment violation. In *Brown*, the second confession, which was "substantially in accord" with the first statement and was made about five hours later, was suppressed because it "was clearly the result and fruit of the first." 422 U.S. at 594–595, 605, 95 S.Ct. at 2257–58, 2262. The Court stated:

> The fact that Brown had made one statement, believed by him to be admissible, and his cooperation with the arresting and interrogating officers in the search for Claggett, with his anticipation of leniency, bolstered the pressures for him to give the second, or at least vitiated any incentive on his part to avoid self-incrimination.

*Id.* at 605 n. 12, 95 S.Ct. at 2262 n. 12. In *Dunaway*, the second confession was made a day after the first and the Court excluded it on the authority of *Brown*. 442 U.S. at 203 n. 2, 218 n. 20, 99 S.Ct. at 2252 n. 2, 2260 n. 20.

Here, as in *Brown* and *Dunaway*, the first confession was the product of the Fourth Amendment violation, and it could be found that the taint caused the second confession because Patino thought she had already given the same information in an admissible confession. *Oregon v. Elstad* held that a second confession is not suppressed merely because the defendant made an earlier confession that is inadmissible because he was not read *Miranda* warnings prior to his making the first confession. The Court, however, stressed that its holding did not apply to confessions resulting from "violations of the Fourth Amendment, which have traditionally mandated a broad application of the 'fruits' doctrine." 470 U.S. at 306, 105 S.Ct. at 1292. The Court attributed this to the

Fourth Amendment exclusionary rule's purpose of "deter[ring] unreasonable searches, no matter how probative their fruits" and the fact that a finding of "voluntariness" is only a threshold inquiry under the Fourth Amendment "fruits" doctrine. *Id.;* see *Taylor,* 457 U.S. at 690, 102 S.Ct. at 2667; *Dunaway,* 442 U.S. at 216–217, 99 S.Ct. at 2258–59; *Brown,* 422 U.S. at 600–602, 95 S.Ct. at 2260–61. The breadth of the Fourth Amendment "fruits" doctrine upon temporally distant second confessions remains an open question.

The magistrate here stated that "[h]ad the August 14 statement been suppressed, it would also be necessary, on this record, to suppress the August 20 statement as the fruit of unlawful actions." (Defendant's App. 34 (n. 14).) Because the magistrate thought the search constitutional, he did not explicate the facts in the record that led him to conclude that the second confession would be fruit of the illegal search. The burden to show admissibility lies with the government, *Taylor,* 457 U.S. at 690, 102 S.Ct. at 2667; *Brown,* 422 U.S. at 604, 95 S.Ct. at 2262, and the government for unknown reasons has neither raised nor briefed this issue. Defendant has raised this issue by asking that the second confession be suppressed as fruit of the illegal entry and search (Defendant's Br. 20), but did not further discuss it. We are left unguided by the parties and rather than decide this difficult question with no briefing, we remand it to the district court for further proceedings. Cf. *Johnson v. Williford,* 821 F.2d 1279, 1288 n. 5 (7th Cir. 1987); *Bonds v. Coca-Cola Co.,* 806 F.2d 1324, 1329 (7th Cir.1986).

Reversed in part and remanded for further proceedings consistent herewith.