In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-4288

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

FRANCIS BELL,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04-CR-202—**Matthew F. Kennelly,** *Judge.*

ARGUED JANUARY 8, 2007—DECIDED AUGUST 31, 2007

Before EASTERBROOK, *Chief Judge*, and ROVNER, and WOOD, *Circuit Judges.*

ROVNER, *Circuit Judge.* Francis Bell, the ransom collector in a deadly kidnapping, sought to suppress evidence of drugs found in his hotel room safe during the course of the kidnapping investigation. The district court denied the motion to suppress finding that the search fell under the exigent circumstances exception to the Fourth Amendment prohibition on warrantless searches. We affirm.

## I.

On February 21, 2004, kidnappers lured businessman Jesus Colon from his place of business and soon thereafter called his wife, Norma Morales, demanding $100,000 in ransom in exchange for his safe return. Morales called the Chicago Police Department to report the crime and a team of law enforcement officers from the Chicago Police Department and the Drug Enforcement Administration ("DEA") dove into action. The next day, the kidnappers called Morales and instructed her to leave the ransom money at the Logan Square subway station in Chicago. Henry Harris, a task officer and group supervisor with the DEA led a team of twenty officers to the area in and around the subway station. DEA Special Agent William Warren disguised himself as a CTA repairman working near where Morales left the ransom bag. A short time before 9:30 p.m., the defendant, Bell, entered the station and picked up the bag. Warren called out to Bell, informed him that he was a police officer, and ordered him to stop. Bell threw the bag in Warren's direction and ran. After a chase and a prolonged struggle, Warren and a fellow officer took Bell into custody.

The officers read Bell his rights, and immediately began to question him. Bell claimed he was homeless and that someone had offered him $500 to pick up a bag from the subway station and throw it over a fence. When asked why he had a low-range two-way radio with him, he initially did not have an explanation, but later explained that he had been instructed to place the radio inside the bag before he threw it over the fence. Upon searching Bell's wallet, the police found approximately $1000 in cash and two key cards from an unspecified Holiday Inn hotel. The officers took Bell to the Area 3 Chicago police station at around ten o'clock that night.

Warren and the other officers initially focused their investigation on the area immediately surrounding the

Logan Square subway station, canvassing the area looking for witnesses and possible confederates. They arrested four suspects in the vicinity of the subway station and took them to the police station for questioning. They were simultaneously guarding the victim's house, monitoring and tracking phone calls to the house, and tracking phone calls made on Bell's cellular telephone. The officers were working throughout the night because they believed that the threat to Colon's life was credible and possibly imminent. The kidnappers had threatened to kill Colon if his wife contacted the police and they were clearly conducting counter-surveillance. When Colon's wife left the house to deliver the ransom, the kidnappers called to ask her why she was not alone. After Bell's arrest, the kidnappers called again to ask why the ransom had not been delivered to the subway station as demanded.

In the mean time, the officers continued to question Bell and he continued to deny all knowledge of the kidnapping, maintaining his story that he was homeless and that someone had offered him $500 to pick up a bag. Bell gave different versions of the story. In one version he was supposed to bring the ransom back to a person. In another, he was instructed to throw it over a fence. The officers doubted the veracity of Bell's tale. They considered that, although Bell claimed to be homeless, his clothing did not appear to be that of a homeless person, he was carrying $1000 in cash, and he had a cellular telephone at the time of his arrest.

Warren arrived at the police station at around 11:00 p.m. and took over the interrogation of Bell. Searching for new leads, Warren turned back to Bell's wallet hoping to find a number, an address, or something else that might eventually lead him to Colon. At around 11:30 p.m., Warren asked Bell about the hotel key cards. Bell told Warren that he and his girlfriend had been staying at a Holiday Inn near O'Hare airport, but had checked out.

Doubting this claim, Warren began calling Holiday Inn hotels located near O'Hare and asking for Francis Bell's room. At some point, Warren telephoned the Holiday Inn at 8201 West Higgins Road in Chicago and when he asked to be put through to Francis Bell's room, the desk clerk connected him to a room. Hoping that Colon would be in that hotel room, Warren and DEA agent George Ohlin left Area 3 almost immediately and drove to the Holiday Inn. The desk clerk noted in her log that the officers arrived at the hotel at 1:30 a.m. After viewing a picture of Bell, the clerk confirmed that he had been staying at the hotel for an extended period of time and had been paying for the room in cash. Upon the request of the officers, the clerk was able to "read the key" to determine that it was assigned to Room 204 at the hotel. The clerk recorded all of this activity in the hotel log. When officers knocked on the door of room 204, Bell's girlfriend opened the door and identified Bell from a photograph, stated that she was his girlfriend, and gave the officers permission to search the room. The kidnapping victim, Colon, was not in the room, nor did the officers find any evidence that he had ever been there. Instead, they found plastic wrappings with powder residue which were similar to wrappings that Warren had seen used to wrap kilogram quantities of cocaine. They also found a locked safe about the size of a breadbox (or, perhaps, in this day and age, a reference to a toaster-oven would be more familiar). The girlfriend told the agents that Bell might have been using the room to sell narcotics and that she believed that there might be narcotics in the safe, but she did not have access to it.

The agents returned to the desk clerk and obtained the access code for the safe. Inside they found a scale, plastic bags, a quantity of powder that tested positive for cocaine, and a pill bottle. The label on the pill bottle contained the name and address of an unknown woman, but a trip

to that woman's address was fruitless, as was a search of the automobile Bell had parked in the Holiday Inn parking lot.

In the district court, the officers testified that prior to searching the safe they had telephoned the police station where Bell was being held and the officers at the station had obtained Bell's written consent to conduct a complete search of the room. Bell signed the consent form at 2:15 p.m. The officers testified that they arrived at the hotel at 2:00 a.m. and did not search the safe until 2:30 a.m.

The district court, however, discredited this testimony and determined that Bell signed the consent form after the officers had already searched the room. Warren testified that he discovered that a Francis Bell had a room at a Holiday Inn on Higgins Road near O'Hare airport at approximately 1:00 a.m. and left the police station almost immediately. Taking judicial notice of the locations of the police station, the Holiday Inn, the nearest highway between the two, and the condition of traffic at 1:00 a.m., the district court determined that the officers would have arrived at the hotel sometime around 1:30 a.m. In fact, after all of the officers had finished their testimony, a Holiday Inn employee testified that a contemporaneous hotel log indicated that the officers had indeed arrived at the hotel at 1:30 a.m. The district court did not believe that the officers would have arrived at the hotel at 1:30 a.m. and not have searched the safe until after 2:15 a.m. It was the police, after all, who maintained that they were facing direly exigent circumstances. Mr. Colon could have been killed (and indeed was barbarically killed around this same time) at any moment.

Bell was indicted for possession with the intent to distribute a controlled substance and filed a motion to suppress the evidence recovered in the safe. Bell entered

a conditional guilty plea pursuant to Federal Rule of Criminal procedure 11(a)(2) specifically reserving his right to have an appellate court review the adverse determination on the motion to suppress. In that motion he argued that his consent to search had not been voluntarily obtained and that the search of the safe violated his Fourth Amendment rights. The district court ruled against Bell on both issues finding that his account of coercion was not credible. The district court also concluded that although Bell had not signed the consent form prior to the time of the search, the warrantless search of the safe fell under the exigent circumstances exception to the Fourth Amendment prohibitions on searches without warrants. The district court sentenced Bell to 300 months' imprisonment. Bell timely appealed only the question of the warrantless search of the safe. The propriety of warrantless searches is reviewed without deference. *Ornelas v. United States*, 517 U.S. 690, 699 (1996).

## II.

The Fourth Amendment "protects the security a man relies upon when he places himself or his property within a constitutionally protected area, be it his home or his office, his hotel room or his automobile." *Hoffa v. United States*, 385 U.S. 293, 301 (1966). Warrantless searches and seizures within a home (and hotel room, *see id.*) are presumptively unreasonable except under certain narrowly proscribed exceptions. *Brigham City v. Stuart*, 126 S. Ct. 1943, 1947 (2006). One of these exceptions allows police officers to search without a warrant to protect or preserve life or prevent serious injury in the event of exigent circumstances. *Mincey v. Arizona*, 437 U.S. 385, 392-93 (1978). This exception "must be strictly circumscribed by the exigencies." *Id.* at 393. It cannot be used merely to make law enforcement more efficient, to safeguard evi-

dence that could be protected in another manner, or simply because a serious crime has been committed. *Id.* at 391-95. On the other hand, the police need not stand by when violence erupts and wait for a blow to render a victim unconscious, but rather may step in to prevent serious injury and restore order. *Stuart*, 126 S. Ct. at 1949; *see also United States v. Elder,* 466 F.3d 1090-91 (7th Cir. 2006) (upholding a warrantless search where a brief and anonymous call about a methamphetamine lab signaled police that the caller might be in danger).

In this particular case, there was no question that the police were entitled to enter and search Bell's hotel room. Disregarding any potential exigent circumstances, Bell's girlfriend consented to the search of the hotel room, and the prohibition on warrantless searches does not apply to situations in which voluntary consent has been obtained, either from the individual whose property is searched, or from a third party who shares, or is reasonably believed to share, authority over the area. *Georgia v. Randolph*, 547 U.S. 103, 126 S. Ct. 1515, 1518 (2006); *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). In this case, there is no dispute that Bell's girlfriend could and did consent to a search of the hotel room. Likewise, there is no dispute that she lacked access to or authority over the safe and could not, therefore, consent to its search.

The only question, therefore, is whether the government can bear the burden of demonstrating that the police faced exigent circumstances when they searched the safe. *See United States v. Marshall*, 157 F.3d 477, 482 (7th Cir. 1998). Exigent circumstances exist if a officer had an objectively "reasonable belief that there was a compelling need to act and no time to obtain a warrant." *United States v. Andrews*, 442 F.3d 996, 1000 (7th Cir. 2006). Bell argues first that any exigencies dissolved once the police arrived and realized that the kidnapping victim, Colon,

was not and never had been in the room. Furthermore, he argues that the police had ample time to obtain a warrant.

The question as to whether exigent circumstances exist is viewed through the eyes of a reasonable police officer. S*tuart*, 126 S. Ct. at 1948. When the officers arrived, they did indeed conclude that Colon was not in the room and never had been there. That conclusion, however, did not eviscerate the exigency. When the officers arrived at the Holiday Inn at 1:30 a.m., Colon was still missing and the ransom was four hours late. The kidnappers, who had already threatened to kill Colon, had called the victim's family again demanding to know why the ransom had not yet been paid. Police officers also knew that the kidnappers were conducting counter-surveillance and that they probably knew that Bell had been arrested.

Bell argues that because Colon himself could not have been hidden in the small safe there were no exigencies that permitted a search of the safe. Although it is true that there was no evidence that Colon had ever been in the room, there was a great deal of evidence to suggest that Bell had been in the room and the officers had compelling reasons to suspect that Bell was involved in the kidnapping. They did not believe that the kidnappers would have trusted a complete stranger to pick up $100,000 in ransom, and the force with which Bell re- sisted arrest made the officers believe that he knew he was on the hook for a serious crime. By the time they found the safe, the officers knew that Bell had lied about being homeless (they knew that, at a minimum, he had been renting a hotel room for a long time and paying in cash), that he lied about having checked out of the Holiday Inn, and that he had tried to conceal the loca- tion of the Holiday Inn in which he had been staying. Of course Colon himself could not have been concealed in the safe, but it could have contained phone numbers to reach accomplices, maps to a hide-out location, notes about the

kidnapping plan, or Mr. Colon's wallet or car keys or other personal effects that would have confirmed Bell's knowledge of Colon's whereabouts.

Recently, in *Stuart*, 126 S. Ct. at 1948-49, the Supreme Court explored the magnitude of urgency required before officers may conduct a warrantless search. In *Stuart* the police encountered sufficiently exigent circumstances for a warrantless entry when they observed, through a screen door, four adults restraining a juvenile. *Id.* at 1949. The juvenile eventually broke free and hit one of the adults who spit blood into a nearby sink. *Id.* at 1946. The other adults continued to try to restrain the juvenile, pressing him up against a refrigerator with such force that the refrigerator began moving across the floor. *Id.* According to the Court, the officers had an objectively reasonable belief that the injured adult might need help and that the violence was just beginning. *Id.* at 1949. They were not required to wait until the violence escalated and a "blow rendered someone unconscious." *Id.* at 1949. In the case before us, the exigencies were even greater. The police knew that Colon could be killed at any time and that Bell might be holding the literal or proverbial key to his whereabouts.

Bell argues that the prosecution has not demonstrated that obtaining a warrant would have been impossible or impracticable during the four hours between Bell's arrest and the search of his room. Bell, however, is focused on the wrong time frame. Since the warrantless search of the room is not at issue, we need only look to see whether there was adequate time to obtain a warrant to search the safe. Bell argues that the clock begins to tick at the moment the officers had the right to obtain a warrant. *United States v. Patino*, 830 F.2d 1413, 1417 (1987). In *Patino*, law enforcement agents knew, about four hours prior to the search that the suspect had committed at least one armed robbery and they had probable cause to

believe he was staying at the defendant's home. *Id.* In addition, one officer, upon spotting the suspect, sat outside his home for thirty minutes waiting for back-up without making any attempts to secure a telephonic warrant. *Id.* at 1416. In this case, on the other hand, the officers had no idea that they would need a warrant to search the safe until they arrived at the room and found first, that there was a safe in the room, second, that the safe was locked, and third, that the girlfriend who had consented to the search of the room could not legally consent to a search of the safe. Prior to the search of the hotel room, the officers simply had no reason to know they would need a warrant to search the safe. The clock began to tick, therefore, at the moment the officers discovered a locked safe.

Bell's brief makes much of the fact that no one asked Bell about the key cards until two hours after his arrest, and argues that had they done so immediately, they could have sought a warrant shortly after 9:30 p.m. But a court may not second guess how the police structure their priorities in an investigation. In this case, the police and agents initially focused their efforts on the area surrounding the Logan Square subway station, hoping that because Bell had a low powered walkie talkie, the kidnappers might be in the vicinity. Bell initially told the officers that he had checked out of the hotel, so the officers did not prioritize a search for the hotel room. Only after they ran out of leads did the officers circle back to review Bell's personal effects and re-prioritize investigation of the key.

In any case, we have already concluded that the only time frame that matters is the time between when the officers discovered a locked safe and the time they sought to open the safe. Within minutes of discovering a locked safe, the officers sought and received access to the safe

from the hotel manager.[1] Indeed, based on the paraphernalia in the room, the officers may have believed that the safe contained drugs, but they may also have believed that the safe contained clues to the whereabouts of Jesus Colon. In any event, their subjective suspicions about the contents of the safe are irrelevant. *Stuart*, 126 S. Ct. at 1948. If a reasonable officer might have believed that the safe contained information that would lead to the safe recovery of Jesus Colon, then those officers were justified in searching the safe immediately rather than waiting for a warrant, even if they also believed they might find evidence of a drug crime. *See id.*

In short, the district court correctly determined that exigent circumstances justified the warrantless search. We need not decide, therefore, whether the doctrine of inevitable discovery (which appears to have been forfeited below in any case) should apply.

The judgment of the district court is affirmed.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*

---

[1] At times, Bell appears to be relying on the officer's now discredited testimony that they waited a half an hour after they arrived at the hotel before entering the room. The district court found otherwise (R. at 50, p. 11), and the government has not challenged this adverse fact finding on appeal.

---