In the

# United States Court of Appeals
## For the Seventh Circuit

No. 02-1002

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BEREND SCHAAFSMA, JR.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 CR 544—**Rebecca R. Pallmeyer**, *Judge.*

ARGUED JANUARY 17, 2003—DECIDED JANUARY 31, 2003

Before BAUER, POSNER, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* Berend Schaafsma, Jr. won a battle but, more importantly, lost a war when a jury found him guilty of involvement in an MDMA (thankfully shortened from its full name: methylenedioxymethamphetamine) sale which was interrupted by police outside a Hooters restaurant in Orland Park, south of Chicago. The battle he won—an order from the district judge granting his motion to suppress evidence obtained after his arrest—forms the basis of his appeal: he says some of the suppressed evidence slipped into the trial and that entitles him to a do-over.

MDMA is a synthetic, psychoactive drug with both stimulant (amphetamine-like) and hallucinogenic (LSD-like)

properties. It goes by various street names—Adam, XTC, hug, beans, the love drug, and most commonly, Ecstasy. It's a dangerous drug—ingesting high doses can cause sharp increases in body temperature leading to muscle breakdown and kidney and cardiovascular system failure. Despite its dangerous propensities, it's a drug in demand. And so, enter Schaafsma and one Richard Marrella on their ill-fated trip to Hooters.

Marrella was an Ecstasy dealer—there's no doubt about that. In June 2000 he got hooked up with Schaafsma, and the two had several conversations about dealing in Ecstasy. In late June or early July, Schaafsma agreed to buy approximately 2,000 pills from Marrella. They met in the parking lot at a Gold's Gym in Orland Park, and Schaafsma gave Marrella cash (in a brown paper bag) in exchange for the pills. After this sale, Schaafsma contacted Marrella every few days to see if Marrella had any more Ecstasy to sell.

On July 10, 2000, Marrella began having telephone discussions regarding the purchase of Ecstasy with a man he knew as Marcus. Unbeknownst to Marrella, "Marcus" was actually Mark Recker, a drug officer acting in an undercover capacity. Marrella and Recker discussed the possibility of Marrella buying a large quantity of Ecstasy from Recker, after which Marrella called Schaafsma to see if he was interested in buying the drugs once they were obtained.

Over the next 2 days, Marrella had conversations with Recker and Schaafsma, brokering a deal involving 5,000 Ecstasy pills. After checking to see if Schaafsma could supply the money, Marrella agreed to buy 5,000 pills from Recker at a price of $6.50 per pill. Schaafsma agreed to buy them from Marrella at a price of $8.00 per pill (a tidy $1.50-per-pill profit for Marrella). During tape-recorded telephone calls, Marrella indicated to Recker that he had

a "guy," referring to Schaafsma, who was working on getting the money together. Eventually, Marrella and Recker agreed to meet on July 12 at the Hooters restaurant in Orland Park to do the deal.

Before the deal was supposed to take place, Schaafsma and Marrella discussed the fact that Schaafsma was not able to come up with the entire $40,000 (5,000 pills at $8 each). Marrella and Schaafsma agreed that Schaafsma should bring the $32,500 needed to pay Recker for the drugs and that Schaafsma would pay Marrella his $7,500 profit after Schaafsma sold the pills.

A little before noon on July 12, 2000, Schaafsma went to Marrella's house with the cash in a brown paper bag. Schaafsma told Marrella that he was $2,000 short, and Marrella put in $2,000 of his own money. Marrella and Schaafsma agreed that Schaafsma would watch Marrella's car with the money in it while Marrella went inside Hooters to meet with Recker. Marrella and Schaafsma drove in separate cars to the restaurant.

In preparation for the meeting, surveillance agents were all over Hooters. At approximately 12:25 p.m. Marrella entered the parking lot in a black Chrysler. Unbeknownst to law enforcement at that time, Schaafsma's car was captured on video tape driving into the parking lot behind Marrella. As seen on the video, Marrella initially entered the parking lot and turned left, but then decided to park in a different location. Schaafsma backed up his car to allow Marrella to back up and park. Schaafsma then drove past Marrella's car and parked facing Hooters, giving him a straight line of vision to Marrella's car.

After parking, Marrella went inside Hooters and met with Recker, who told Marrella that he wanted to count the money. They then left the restaurant and went to Marrella's car.

As they were walking to Marrella's car, Marrella asked Recker about bringing the pills to the parking lot. Marrella stated that his "guy" was waiting in the lot to take the pills away, at which time Marrella gestured in the general direction of a blue Toyota where a man was sitting alone.

Marrella and Recker got into Marrella's Chrysler. Recker opened the glove box and confirmed that a large sum of money—20's, 50's and 100's—encased in a paper bag, was there. Recker and Marrella discussed going back inside Hooters after they made the exchange of drugs and money.

As they were walking back toward Hooters, Recker gave a prearranged arrest signal to the surveillance agents, and the charade was over. Agents descended, and as Marrella was placed under arrest, Recker informed other officers that the blue Toyota was involved in the deal. At that time, Officer Anthony Lietzow observed the Toyota leaving the parking lot at a speed he described as "quicker than usual, like in a hurry to get out of the parking lot." Officers ran across the parking lot and stopped the car, placing Schaafsma under arrest.

Prior to trial, Schaafsma filed what he called a "Motion to Quash Arrest and Suppress Evidence," claiming that there was no probable cause for his arrest and that any evidence from that arrest should be suppressed. After a hearing, although finding that "the officer's testimony was very credible," the district court concluded that the agents did not have probable cause to arrest Schaafsma. The district court reasoned that there should have been more certainty with regard to which car Marrella was referring to when he told Recker his partner was in the lot. After the ruling, the government asked if it would be able to introduce at trial "evidence of everything that happened in the parking lot, Marrella's reference to Mr. Schaafsma or to the blue Toyota, the exiting of the blue

Toyota [from the lot] and the fact that it was stopped." The district court agreed that this evidence could be introduced.

As a result of this pretrial suppression ruling, the jury never learned that after his arrest, Schaafsma admitted that he was in cahoots with Marrella, that he was at Hooters to pick up the Ecstasy, and that he was going to sell the pills to someone named "Jamal," a person with whom he had been dealing drugs for the past 6 months.

On this appeal, Schaafsma writes that, after granting his motion to suppress, the district court "erred in permitting the Government to introduce into evidence at the trial of this case and before the jury testimony by Government witnesses of facts surrounding the defendant's arrest and the identification of his automobile and other circumstantial evidence tending to prove guilt which was directly obtained as a result of Appellant's illegal arrest in violation of his Fourth Amendment United States Constitutional Rights."

The short answer to this claim is that the admitted evidence—historical facts about the presence of Schaafsma and his Toyota in the lot—did not violate the suppression order. The even shorter answer is that, with all due respect to the distinguished trial judge, we think she erred in granting the motion to suppress in the first place.

In reviewing a suppression order, findings of fact are reviewed for clear error. *United States v. Duguay*, 93 F.3d 346, 349-50 (7th Cir. 1996). The ultimate conclusion regarding whether law enforcement officers had probable cause, however, is reviewed *de novo*. *Ornelas v. United States*, 517 U.S. 690, 699 (1996). Here, the facts are not in dispute, and we think they lead to the clear conclusion that the agents had probable cause to arrest Schaafsma as he tried to leave the Hooters lot.

A police officer has probable cause to make an arrest "when the facts within the officer's knowledge and of

which the officer has reasonably trustworthy information are sufficient to warrant a prudent person in believing the suspect has committed or is committing an offense." *United States v. Sawyer*, 224 F.3d 675, 678-79 (7th Cir. 2000). Probable cause requires only a substantial chance of criminal activity, not an actual showing of such activity. *See Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983). Although mere suspicion is not enough, probable cause "need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false." *United States v. Burrell*, 963 F.2d 976, 986 (7th Cir. 1992) (quoting *Hughes v. Meyer*, 880 F.2d 967, 969 (7th Cir. 1989)). The determination of whether probable cause exists in a given situation involves examining the totality of the circumstances in a common sense manner. *Sawyer*, 224 F.3d at 679.

And what were the "facts" here? First, during the negotiations leading up to the sale it was clear that Marrella was brokering the deal for a person supplying money. Twice during his taped conversation with Recker, Marrella said his "guy" would be getting the drugs.

Second, from Marrella's lips during the deal, officer Recker knew that Marrella's "guy" was in a car in the parking lot. Marrella's gesture toward the parking lot caused Recker to look and see a blue Toyota with an individual sitting in it behind the wheel. The Toyota was facing Marrella's car without anything obstructing its view. When Marrella was arrested and bedlam broke out, the Toyota was the only car that tried to leave the lot, and it did so at a speed that a seasoned surveillance officer knew was faster than usual. While mere presence at the scene of a crime is not enough to establish probable cause, we know that it is generally accepted that "flight can be strong evidence of guilt." *United States v. Lima*, 819 F.2d 687, 689 (7th Cir. 1987). And here, the police had presence plus flight plus Marrella's statements

clearly indicating that someone in the lot was his "guy" involved in the sale. Given this evidence, the grant of a motion to suppress is not only puzzling, but wrong. We have no trouble concluding that probable cause existed, and thus less evidence than the government possessed was admitted against Schaafsma during his trial.

For this reason, Schaafsma's conviction, and unchallenged 41-month sentence, are AFFIRMED.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*