In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 10-1055, 10-1076

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DONALD W. SIMMS, II,

*Defendant-Appellant.*

Appeals from the United States District Court
for the Eastern District of Wisconsin.
Nos. 07-CR-223, 08-CR-86—**Charles N. Clevert, Jr.**, *Chief Judge.*

ARGUED SEPTEMBER 13, 2010—DECIDED NOVEMBER 23, 2010

Before EASTERBROOK, *Chief Judge*, and POSNER and
TINDER, *Circuit Judges*.

POSNER, *Circuit Judge*. The defendant pleaded guilty
to gun and drug offenses and was sentenced to a total
of 270 months in prison—240 months for those offenses
(of which 180 months was the mandatory minimum
sentence for the gun offense because in combination
with his three previous "serious drug offense[s]" it made
him an armed career criminal, 18 U.S.C. § 924(e)(1))—plus

30 months for having violated supervised release. His appeal raises both Fourth Amendment and sentencing issues.

His guilty plea reserved to him the right to appeal from the district judge's denial of his motion to suppress evidence seized pursuant to a warrant that had been based in part on marijuana found in a search of garbage cans at his home in Milwaukee. Without that find the search warrant would not have been supported by probable cause.

The affidavit on the basis of which the search warrant was issued alleged the following facts: The defendant's garbage carts (wheeled garbage containers) were located in the yard of his house, next to his driveway. "[O]n trash pick-up day," the affidavit states, the carts "are taken to the end of the curb" (we're not sure exactly what that means, but probably it means abutting the street) by the homeowner. A police detective had, however, collected the defendant's garbage from a garbage cart that she found "inside the fence"—a fence six feet high surrounding the yard—and searched it. This was early in the morning of Friday, December 7, and the detective was "aware that the regular trash pick up day for this location is Friday, and that as of December 1 the city garbage collector retrieves the garbage from the [owner's] property for snow removal reasons." The implication was that the defendant could be assumed to have consented to have his garbage cart wheeled from his property to the street by the garbage collectors when the city's "winter rules" are in effect.

The affidavit did not mention that the height and opacity of the fence prevented anyone driving or walking by on the street from seeing inside the yard, that the fence had a gate that when closed blocked entry to the yard, that a "No Trespassing" sign was affixed to the gate, and that although the gate was open when the detective entered and searched the garbage cart, the accumulation of snow that morning prevented it from being closed.

The affidavit is silent on whether garbage collectors ever actually went on the defendant's property to collect his garbage. He testified at the suppression hearing that he always wheeled his garbage carts to the curb or the end of the driveway—but not that he had an understanding with the garbage collectors that they were not to enforce "winter rules" against him. Presumably they would have ignored such a request, since the rules are intended to prevent interference with the city's snowplows.

It appears, moreover, that the "winter rules" had the force of law, thus creating an easement to enter the defendant's property to collect garbage. Milwaukee Code of Ordinances § 79-5(3) makes it "the responsibility of the owners and tenants of every premises where solid waste is collected to provide a clear and unhindered path to all containers. The path shall be a width specified by the commissioner and shall be free of hindrances such as, but not limited to, large debris, vehicles, locked fences, animals, ice or *3 or more inches of snow*" (emphasis added). And § 79-3(1) requires that trash containers "be

free and fully accessible at all times for handling for collection." Homeowners are informed at the onset of winter, by flyers placed on their garbage carts, that sanitation workers will be wheeling the carts from the homeowners' property to the garbage trucks in the streets.

Because none of these facts was disclosed to the judicial officer who issued the search warrant, we hesitate to uphold the search of the house, pursuant to the warrant, on the ground that the officers who searched it were relying in good faith on the warrant's validity—though one can argue, as Judge Friendly did many years ago, for a good-faith defense that might cover a case such as this. "The beneficent aim of the exclusionary rule to deter police misconduct can be sufficiently accomplished by a practice . . . outlawing evidence obtained by flagrant or deliberate violation of rights." Henry J. Friendly, "The Bill of Rights as a Code of Criminal Procedure," 53 *Cal. L. Rev.* 929, 953 (1965) (footnote omitted). In Judge Boudin's paraphrase, "The deterrent value of exclusion is minimal for inadvertent fumbles, and the evidence remains reliable albeit wrongly seized." Michael Boudin, "Judge Henry Friendly and the Mirror of Constitutional Law," 82 *N.Y.U. L. Rev.* 975, 990 (2007). And so the government argues in this case that the exclusionary rule should not apply when a search is based on a mistaken, but innocently mistaken, belief that it is lawful.

The Supreme Court has not gone this far as yet, though it came close in *Herring v. United States*, 129 S. Ct. 695 (2009); see also *Arizona v. Evans*, 514 U.S. 1, 10-16 (1995).

Nor have we; nor need we in this case. Although the district judge did not rule on whether the omission from the affidavit of facts concerning the garbage search was accidental or deliberate, excusable or inexcusable, on balance the omitted facts confirm the legality of the search. The Milwaukee ordinance alone could well be thought decisive support for it. Privacy in the sense of concealment (of sensitive information, of the body, etc.) is conventional: it depends on expectations that vary across societies and across time. We cannot see how an expectation of privacy that can be realized only by breaking the law can be considered reasonable and therefore protected by the Constitution, unless the law in question is invalid.

And when the gate was open, as it was when the detective conducted the search, the garbage collectors would assume that the defendant wanted his garbage cart emptied; and what they reasonably believed they could do, the detective could do. Not that police can go searching any private place that some other stranger is entitled to enter. *Stoner v. California*, 376 U.S. 483, 489 (1964)**.** The fact that one's cleaning service is authorized to enter one's home and empty the wastepaper baskets does not authorize the police to enter one's home and search those baskets. Nor does the fact that one throws papers (or for that matter marijuana butts) into a wastepaper basket authorize the police to enter your house to search the basket on the theory that you abandoned whatever property you placed in it.

The reason for these limitations on police searches is that people have a strong interest—call it privacy or

rights of property—in keeping unwanted strangers, including law enforcement officers, out of their home, and the interest is deemed a reasonable one in our society. People have a similar interest in excluding strangers from the property that immediately surrounds their house. If they are sunbathing in the nude in their fenced yard they do not want the police entering the yard to search garbage carts. Not that that was a likely activity on a snowy day in December. But a homeowner's garbage carts can be unavoidably proximate to portions of his property used for private activities. Hence the concept of the "curtilage," a variant of the Old French word for a little court[yard]. It is not the entirety of a person's property; it is just the part used for private activities. *United States v. Dunn*, 480 U.S. 294, 301 (1987); *California v. Ciraolo*, 476 U.S. 207, 212-13 (1986); *Oliver v. United States*, 466 U.S. 170, 180 (1984). As the emphasis in interpretation of the Fourth Amendment shifted (ahistorically) from the protection of property to the protection of privacy, *Kyllo v. United States*, 533 U.S. 27, 31-32 (2001); *Warden v. Hayden*, 387 U.S. 294, 301-07 (1967); Morgan Cloud, "Pragmatism, Positivism, and Principles in Fourth Amendment Theory," 41 *UCLA L. Rev.* 199, 221-22, 248-49 (1993), parts of one's property that don't play host to private activities lost much of their Fourth Amendment protection. *Oliver v. United States*, *supra*, 466 U.S. at 177-84. But curtilage—the part of one's property, besides the house itself, in which private activities normally take place—remains protected.

We are not prepared to say that a place in which garbage carts or cans are kept can never be part of the curtilage. People who live in cities and have small

yards prefer to leave their garbage carts in an alley, if there is one next to their house. If not, they will have to leave the carts in their yard, often in a shed at the edge of the yard; in our case the carts were left next to the segment of the driveway that is inside the fenced yard.

But the fact that the defendant's garbage carts were (we may assume) within the curtilage of his home does not conclude the constitutional analysis. For there is the ordinance, and there is a related issue of apparent consent to the search. Suppose that every Friday the defendant opened his gate, placed his garbage carts in the middle of the driveway just inside the open gate, and by these moves signaled that he wanted the garbage collectors to enter the yard, wheel the garbage carts to the street, empty them, and return them to their place in the driveway. This would show that nothing very private was going on in the yard on garbage-collection day. By leaving the gate open when winter rules were in force, without notice that the garbage collectors were not to enter—a notice they would not be bound to obey because it would violate the ordinance—the defendant allowed a reasonable person to think that nothing private was going on in his yard because he could expect the garbage collectors to enter it and wheel away the carts, consistent with the winter rules of which all homeowners were notified. That would be the natural inference from the circumstances although it is possible that the gate was open only because the snow prevented it from being shut. (But then the defendant must have opened it earlier.)

We conclude that the garbage search was lawful—that it was authorized by an appearance of consent to collect the garbage from the fenced yard under winter rules with the gate open. But there is another Fourth Amendment issue: whether the search of the defendant's car that yielded the gun that provided the basis for his mandatory 15-year sentence as an armed career criminal was permissible.

Police conducting undercover surveillance in preparation for executing the warrant to search the defendant's house saw him drive his car to his house, park it across the street, walk to another car, which had just backed into his driveway, take from the trunk of that car a package that a police officer testified was consistent with the way that he'd seen marijuana packaged before, and carry the package into his house. The police had every reason to think the package contained drugs (as indeed it did); the question is whether they had probable cause to think there was contraband or evidence of crime in the defendant's car as well. The answer is yes. They had reason to believe that he was a drug dealer and used his car in his drug business. Hence the car probably contained money, a gun, or evidence (even if just trace quantities) of illegal drugs, especially since the defendant was driving to a rendezvous with another drug dealer. Cf. *United States v. Stotler*, 591 F.3d 935, 939-40 (7th Cir. 2010).

Moreover, he was about to be arrested, and jailed indefinitely. His car could not be left unattended indefinitely. Eventually it would have been impounded by

the police and subjected to an inventory search. The discovery of the gun was thus inevitable. *Nix v. Williams,* 467 U.S. 431 (1984); *United States v. Stotler, supra,* 591 F.3d at 940.

We turn to the sentence. The government has confessed error, stating:

> Simms challenges his sentence on several grounds. He claims the district court did not adequately explain its choice of sentence, relying on Simms' criminal record to the exclusion of other section 3553(a) factors, a record already accounted for in the calculation of the armed career criminal portion of the sentence. Simms complains that the district court failed to adequately explain its decision to impose consecutive sentences, or acknowledge that a guideline sentence would have involved concurrent sentences. Simms contends that the district court seemed unaware that the sentence it imposed exceeded the Guidelines range. Finally, Simms argues that the district court improperly relied on the prospect of a successful sentencing appeal in deciding to impose the revocation sentence consecutively to the other sentences.

> The government concedes that the record does not contain sufficient indication the court was aware that the sentence it imposed exceeded the guidelines range, nor does it contain a sufficiently clear explanation for the court's choice of sentence. As a result, the United States respectfully concedes that a remand for resentencing would be appropriate.

The judge erred, but only in two minor respects. There may be no need for another sentencing hearing.

He revoked the order of supervised release that had been issued in conjunction with a previous conviction of the defendant, ordered him imprisoned for 30 months as punishment for his violation of the terms of the supervised release, and made the 30-month sentence run consecutively to the sentences for the crimes of which the defendant was convicted in the present case. But the judge's reason for making that sentence consecutive (or so the defendant argues and the government, in the passage we just quoted, agrees) was that if the defendant succeeded on appeal in knocking out one or more of his other sentences, what remained might be insufficient to provide adequate punishment for his crimes considered as a whole. That is illogical because it means that if the other sentences are affirmed on appeal, as we are about to do (with a minor qualification), the defendant ends up with a heavier overall sentence than the judge intended to impose.

We don't think the judge was confused over whether he was giving the defendant the shortest sentence he could. He said he was giving the defendant the *mandatory* minimum for the gun offense—that is, the 180 months. He added 60 months (before the further addition of 30 months for violation of supervised release) because otherwise the defendant would have been punished only for the gun offense, the source of the 180-month term. After saying he'd imposed the mandatory minimum of fifteen years for that offense the judge explained that

"additional time was necessary in this case in light of the defendant's long career as a criminal starting from the time he was very youthful. So that is why I made the other counts consecutive to count two." The result was a total sentence of 240 months before the judge's mistaken addition of the sentence for violation of supervised release, an addition not based on the judge's belief about what the proper overall sentence should be.

That was five months above the guidelines range of 188 to 235 months, however, and while the sentence cannot be said to be "unusually high," as in *United States v. Kirkpatrick*, 589 F.3d 414, 416 (7th Cir. 2009), there is a question whether the judge knew that he was sentencing the defendant above the guidelines range. In the "Statement of Reasons" for the sentence, required by 18 U.S.C. § 3553(c)(2), the judge checked both the box that said "The court imposes a sentence outside the advisory sentencing guideline system" and "The sentence imposed is . . . below the advisory guideline range." Probably the second check was an error, but out of an abundance of caution we are ordering a limited remand to enable the judge to advise us whether he wants to resentence the defendant. *United States v. Paladino*, 401 F.3d 471, 483-84 (7th Cir. 2005).

And finally there's no reason to think the judge gave excessive weight to the defendant's criminal history. That history, which was extensive, figured in the calculation of the guidelines range, but a judge is permitted to give more weight to criminal history than the guidelines do. Nor is it apparent what additional

sentencing factors identified in 18 U.S.C. § 3553(a) the judge ignored. As he explained,

> The court, in imposing its sentence in this matter, has certainly taken into account your age, Mr. Simms, and your background and the need to deter the on-going sale of drugs contrary to law. When I look at your record and the fact that you've had offenses in the past, where you've had guns, when I look at the opportunities you've been given in the past to comply with the conditions of supervision and release and the violations that have occurred during the pendency of the various cases, it seems to me that this sentence is reasonable and no greater than necessary under the circumstances to achieve the purposes set out in the statutes, and that has motivated the court to sentence you as I have.

To conclude, the sentences must be corrected to make the sentence for violation of supervised release run concurrently with the other sentences; and the judge is to inform us whether he wants to resentence the defendant to a sentence within the applicable guidelines range. In all other respects the judgment is

AFFIRMED.