In the

# United States Court of Appeals
## For the Seventh Circuit

No. 18-2279

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MICHAEL P. HALDORSON,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:15-cr-00623-1 — **Matthew F. Kennelly**, *Judge.*

ARGUED SEPTEMBER 26, 2019 — DECIDED OCTOBER 23, 2019

Before BAUER, MANION, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Michael Haldorson is a self-pro-
claimed fireworks enthusiast. But he was also a drug dealer.
Haldorson was arrested on his way to a second controlled buy
and, along with drugs, officers found three pipe bombs in his
car. He was charged with several counts related to drugs, ex-
plosives, and a firearm. Before trial, Haldorson filed several
motions to suppress evidence, challenging his arrest, the ad-
missibility of his post-arrest statements, and the searches of

his car, apartment bedroom, and rented storage locker. All were denied.

Haldorson proceeded to trial and a jury convicted him on four counts of the seven-count indictment: Count One for distribution of cocaine, 21 U.S.C. § 841(a)(1); Count Two for possession with intent to distribute cocaine, 21 U.S.C.§ 841(a)(1); Count Three for possession of MDMA, or ecstasy, and cocaine, 21 U.S.C. § 844(a); and Count Four for possession of an explosive during the commission of a felony, 21 U.S.C. § 844(h)(2). The jury acquitted him on two additional charges and the government dismissed another count at trial. The district court later vacated Count Three because it was a lesser-included offense of Count Two. The district court sentenced Haldorson to a term of imprisonment of 192 months.

On appeal Haldorson raises three issues. First, Haldorson argues that the district court erred in denying the motions to suppress the evidence seized from his car and his apartment because the officers lacked probable cause to stop and arrest him and there were no exigent circumstances to justify the warrantless search of his apartment bedroom. Second, he asserts that the jury instructions constructively amended Count Four of the indictment, unlawfully carrying an explosive, in violation of the Fifth Amendment by permitting the jury to convict him on a broader basis than the indictment charged. Third, and finally, Haldorson contends that he did not receive a fair trial due to a multitude of alleged mistakes and errors during the investigation and asks us to vacate his convictions.

We conclude that probable cause supported the arrest, exigent circumstances existed for the search of the bedroom, and Haldorson had a full and fair opportunity to defend himself

at trial. We, therefore, affirm the district court's judgment in all respects.

## I. The Arrest and Vehicle Search

We begin, naturally, with Haldorson's arrest and the resulting search of his vehicle.

### A. Background

Haldorson was arrested on June 23, 2015, but his case starts a few weeks earlier. Sometime in April or May 2015, Haldorson first came on the radar of Officer Thomas Insley via a confidential informant. Officer Insley was, at the time, a patrol officer with the Village of Rockdale Police Department in Illinois. He was also assigned to a specialized narcotics unit, the Will County Cooperative Police Assistance Team (CPAT)—a collective of officers from local police departments under the umbrella of the Illinois State Police—as an Inspector. (For ease we will use the title of "Officer" for Insley throughout, although he also held the title of "Inspector" during the relevant time period.) CPAT inspectors, in general, conduct narcotics investigations, control informants, and go undercover. Officer Insley was the primary CPAT investigator for Haldorson's case.

Officer Insley had been working with this particular confidential informant for a few months—a detail we will return to later—when the informant told Officer Insley that he could purchase cocaine from an individual he knew as "Mike Jones." The informant provided Officer Insley with a picture of Mike Jones's vehicle, including the license plate (that read

"MKJNZ"), and his telephone number.[1] Officer Insley ran the license plate through a law enforcement database and learned that it was registered to Haldorson. The vehicle information listed on the registration also matched the photograph of Haldorson's car—a black Pontiac G8. Officer Insley then showed the informant a picture of Haldorson, who the informant identified as Mike Jones. At this point, Officer Insley asked the informant to set up a deal.

On June 1, 2015, the informant contacted Officer Insley and told him that he could make a buy from Haldorson. Officer Insley proceeded to prepare for the controlled purchase by providing the informant with funds to buy the narcotics, wiring the informant with an audio transmitter and recorder to monitor the deal, and setting up a visual surveillance team of other CPAT officers. Before heading to the controlled buy, Officer Insley also searched the informant and his vehicle to make sure that he had no contraband, as is standard in these operations.

Officer Insley followed the confidential informant to a Walmart parking lot in Joliet, Illinois, where he was going to meet Haldorson, and parked about an aisle over from the informant. Haldorson then arrived, parked next to the informant's car, and the informant got out of his car and into Haldorson's car. At about that same time a customer pulled into the lot and parked in between Officer Insley and Haldorson's car, obstructing Officer Insley's view of the transaction. Not

---

[1] This Mike Jones's phone number was not, however, 281-330-8004. For those unfamiliar with the reference, Mike Jones is an American rapper whose hit single in 2005 included a verse that recited his phone number and told listeners to "hit Mike Jones up on the low." *See* Mike Jones, *Back Then*, *on* Who Is Mike Jones? (Warner Bros. Records 2005).

to worry, though, Officer Insley was still able to listen to the deal in realtime from the audio transmitter.

After the deal went down, Officer Insley observed a black car matching the description of Haldorson's car drive away and relayed to the rest of the surveillance team that the controlled buy was successful and to follow Haldorson's car. Meanwhile, Officer Insley followed the informant to a prearranged location where Officer Insley retrieved the drugs from the informant, as well as re-searched the informant and his vehicle. The confidential informant had purchased 1.7 grams of cocaine from Haldorson in the transaction.

The surveillance team did not stop Haldorson that evening; the officers eventually lost him when they got stopped at a red light. But the plan was never to stop or arrest Haldorson on June 1st because Officer Insley was just beginning his investigation into Haldorson. Further, Officer Insley testified that if the officers arrested Haldorson immediately after the controlled buy, it would have tipped off Haldorson that he had been set-up by the confidential informant. Officer Insley was using the same informant in other ongoing investigations and did not want to burn the informant's identity.

From the record it appears that very little was done to advance the Haldorson investigation between the June 1st controlled buy and June 23rd. There were perhaps, though it is somewhat unclear, attempts by the confidential informant to reach out to Haldorson to set up another controlled buy on June 2nd and 5th, but those went nowhere.

On June 23, 2015, the day at the center of this case, the confidential informant told Officer Insley that he could arrange another drug deal with Haldorson. The plan this time was for

the informant to set it up but for officers to stop Haldorson on his way to the deal and arrest him. Stopping and arresting Haldorson before the actual drug deal would, once again, preserve the confidential informant's anonymity. Eventually Haldorson and the informant agreed to meet in the Village of Plainfield, Illinois, specifically at Plainfield Central High School. Officer Insley then arranged for a Plainfield police officer in a marked car to pull Haldorson over.

Officer Friddle of the Plainfield Police Department positioned himself near the high school and waited for Haldorson to pass by based on a description of Haldorson's vehicle that CPAT officers provided: black Pontiac G8 with a White Sox specialty license plate and red lights in the front grille of the car (that may or may not be illuminated). According to Officer Friddle, he soon saw a black car approaching with red lights in the grille.[2] As it got closer, he could see the White Sox specialty plates too. Officer Friddle pulled out to follow Haldorson's car, activated his emergency lights, and pulled Haldorson over at the entrance of Plainfield Central High School. The stop was pretextual, and Officer Friddle made up some

---

[2] Haldorson strongly contested—and still does—the officers' testimony about both the presence of the red lights on his car at the June 1st controlled buy (Haldorson testified and introduced receipts to demonstrate that the lights were not installed until three days later on June 4th) and whether the red lights were in fact illuminated when he was pulled over on June 23rd. The district court agreed with Haldorson on this point, finding that although there was a red area in the vent on top of the front hood of the vehicle, there were not illuminated red lights. In the end, any dispute regarding the red grille lights is inconsequential to the contested issues in this appeal.

excuses to buy time for CPAT officers to arrive on scene and take over.

Officer Mario Marzetta, a police officer with the Plainfield Police Department who at the time was also assigned to CPAT, arrived at the traffic stop shortly thereafter and arrested Haldorson. Another officer transported Haldorson to the Plainfield Police Department. Officer Marzetta then also drove Haldorson's vehicle to the Plainfield Police Department and parked it in the sally port, or the garage at the station, where he and another CPAT inspector searched it.

The officers found numerous drugs—marijuana, cocaine, crack cocaine, MDMA or ecstasy, prescription pills, psilocybin mushrooms—fireworks, and suspected pipe bombs in Haldorson's car. Upon discovering the pipe bombs, the officers ceased their search and called in agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and the Cook County Sheriff's Police Bomb Squad. The ATF agents and bomb technicians removed the explosives from the vehicle to a safe area and rendered them safe.

We pause the story here to address Haldorson's challenge to his arrest and the search of his vehicle.

**B. Analysis**

Haldorson was later indicted on several federal charges. He thereafter moved to suppress, among other evidence, the explosives and narcotics discovered during the vehicle search because the officers lacked probable cause to stop and arrest him. The district court, after holding a two-day evidentiary hearing, denied his motions to suppress. In reviewing the district court's denial of a motion to suppress, we review questions of law de novo and factual findings for clear error.

*United States v. Cherry*, 920 F.3d 1126, 1132 (7th Cir. 2019). We must defer to credibility determinations that the district court made based on the testimony presented to it, absent clear error. *United States v. Jones*, 900 F.3d 440, 449 (7th Cir. 2018).

### 1. Probable cause to arrest Haldorson

The officers did not have a warrant to arrest Haldorson, "but an officer may make a warrantless arrest consistent with the Fourth Amendment if there is 'probable cause to believe that a crime has been committed.'" *United States v. Daniels*, 803 F.3d 335, 354 (7th Cir. 2015) (quoting *Washington v. Haupert*, 481 F.3d 543, 547 (7th Cir. 2007)). "Police officers possess probable cause to arrest when the facts and circumstances within their knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect has committed an offense." *United States v. Howard*, 883 F.3d 703, 707 (7th Cir. 2018) (quotations omitted). We examine "the totality of the circumstances in a common sense manner" to determine whether probable cause exists in a given situation. *United States v. Schaafsma*, 318 F.3d 718, 722 (7th Cir. 2003).

Haldorson's primary contention is that the information from the controlled buy was too stale three weeks later to support probable cause for an arrest. The mere passage of time does not necessarily dissipate the probable cause for an arrest. It is well-established that "there is no requirement that an offender be arrested the moment probable cause is established." *United States v. Reis*, 906 F.2d 284, 289 (7th Cir. 1990) (citing *Hoffa v. United States*, 385 U.S. 293, 310 (1966)). In *Reis* we found that an "overnight delay simply has no bearing on the existence of probable cause for arrest," *id.*, and we see no reason to treat reasonably longer delays any different. Indeed,

we have previously held that the defendant's participation in a controlled drug buy a month earlier "provided the police with probable cause to arrest [the suspect] which was not rendered stale by the passage of one month." *United States v. Mitchell*, 523 F. App'x 411, 414 (7th Cir. 2013) (per curiam). Our sister circuits also agree that the passage of time alone does not render probable cause to arrest stale. *See, e.g.*, *United States v. Azor*, 881 F.3d 1, 9 (1st Cir. 2017) ("Our case law makes clear that law enforcement is not required to arrest a suspect immediately upon development of probable cause."); *United States v. Clark*, 647 F. App'x 419, 422 (5th Cir. 2016) (per curiam) ("[P]robable cause existed to arrest [the defendant] because the earlier tip from the confidential informant and the controlled purchase [four to six days earlier] provided [the police] with facts that would support a reasonable person's belief that an offense had been committed and that the individual arrested was the guilty party." (cleaned up)); *United States v. Winchenbach*, 197 F.3d 548, 554 (1st Cir. 1999) ("[W]hen probable cause exists, the timing of an arrest is a matter that the Constitution almost invariably leaves to police discretion."); *United States v. Bizier*, 111 F.3d 214, 220 (1st Cir. 1997) (holding that "the period of time between the controlled buys [—four days after the second controlled buy and less than two weeks after the first controlled buy—] and the arrest was not so long here as to render the probable cause stale in any meaningful temporal sense"); *cf. Guadarrama v. United States*, No. 16-6218, 2017 WL 3391683, at *2 (6th Cir. Feb. 13, 2017) (unpublished order) (stating that "[r]easonable jurists could not debate th[e] conclusion" that "while information used to obtain a search warrant may go stale, the same is not true for information underlying an arrest warrant").

Our facts are nearly identical to those that the Tenth Circuit confronted in *United States v. Hinson*, 585 F.3d 1328 (10th Cir. 2009). There, the police arranged for a controlled buy between an informant and the defendant at an auto parts store. Police surveilled the informant while he drove to the location, got into the defendant's car, and negotiated the purchase of methamphetamine. *Id*. at 1331. The police did not immediately arrest the defendant, "[a]pparently hoping to investigate further." *Id*. About a month later, the police sought to have the informant conduct another controlled buy but the informant refused (even though a few days earlier he told the police he could set up another deal). Unable to convince the informant to cooperate, the police resolved to arrest the defendant. Instead of obtaining an arrest warrant, they decided to simply follow his car until he committed a traffic violation and then stop and arrest him—which they did. *Id*. at 1331–32. The Tenth Circuit held that the police officers had probable cause to arrest the defendant "based on the controlled buy they witnessed a month before his arrest." *Id*. at 1334. "[T]he passage of time did not make that information stale or otherwise destroy the officers' probable cause." *Id*.

There was probable cause to arrest Haldorson on June 23, 2015, based on the June 1, 2015, controlled buy. The facts overwhelmingly support this conclusion. The confidential informant first provided Officer Insley with Haldorson's phone number and a picture of his black Pontiac G8, including the license plate. Officer Insley was able to run the license plate through a law enforcement database and trace the car's registration to Haldorson. The informant then positively identified a photograph of Haldorson as his drug supplier. But the probable cause for the arrest was not merely based on a "tip" from

a confidential informant[3]—that was just the beginning. The officers then set up a controlled buy. Multiple officers were surveilling the deal and observed Haldorson's car drive into the parking lot at the prearranged location, park next to the confidential informant, and the confidential informant get into the passenger seat of Haldorson's car. Although no officers witnessed the actual transaction, Officer Insley listened to the entire interaction in realtime via the informant's hidden wire. Officer Insley also searched the confidential informant and his car both before and after the controlled buy; the only drugs he had were the 1.7 grams of cocaine purchased from Haldorson during the controlled buy. On this last point, critically, the district court found Officer Insley's testimony credible, and we certainly cannot say that that finding was clearly erroneous. The passage of three weeks did not render the information from the controlled buy stale.

It is the rare case where "staleness" will be relevant to the legality of a warrantless arrest.[4] When there is a reasonable

---

[3] Haldorson makes repeated references to initially undisclosed information regarding the confidential informant's history—including how he came to be an informant, his motivation (was he working for money or working off his own case), and the fact that he was arrested on an unrelated incident approximately ten days before the controlled buy. If Officer Insley had relied on an affidavit from the confidential informant in an application for a search warrant, the nondisclosure of such credibility information would be relevant to the question of probable cause. *United States v. Musgraves*, 831 F.3d 454, 460 (7th Cir. 2016). But this case does not involve simply relying on information from a confidential informant in an affidavit.

[4] Conversely, the concept of staleness is generally a "highly relevant" factor in applications for search warrants because, unlike arrests, the focus is on whether "evidence of a crime will be found in a particular place" and

belief that someone has committed a crime, time by itself does not make the existence of that fact any less probable. Certainly, "[g]ood police practice often requires postponing an arrest, even after probable cause has been established, in order to place the suspect under surveillance or otherwise develop further evidence necessary to prove guilt to a jury." *United States v. Watson*, 423 U.S. 411, 431 (1976) (Powell, J., concurring). This is not to say that the passage of time can never dissipate probable cause to arrest. There could be circumstances in which the subsequent investigation turns up new facts or evidence that disprove or discredit the original information. *Cf. id.* at 432 n.5. We simply do not have those facts here and thus do not need to address if or when probable cause to arrest may become stale.

The information provided by the confidential informant and the June 1st controlled buy provided probable cause to arrest Haldorson on June 23, 2015.

### 2. *Vehicle search*

Haldorson makes passing references to the search of his car but does not meaningfully contest the district court's ruling that the evidence would have been inevitably discovered. In any event, Haldorson's challenge fails. The inevitable discovery doctrine provides that illegally obtained evidence will not be excluded if the government "can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984). Once Haldorson was lawfully arrested, his "car could not be left unattended

---

often involve a search for perishable or transportable objects, like drugs or guns. *United States v. Bradford*, 905 F.3d 497, 503–04 (7th Cir. 2018).

indefinitely" at the entrance of a public high school. *United States v. Simms*, 626 F.3d 966, 971 (7th Cir. 2010); *see also United States v. Stotler*, 591 F.3d 935, 940 (7th Cir. 2010) ("[O]bviously, the arresting officers would not have allowed the truck to just sit on the street after [the arrestee] was carted away."). The police officers would have towed his vehicle to the police station and conducted an inventory search of the vehicle per established Plainfield Police Department procedures. "The drugs [and explosives], therefore, inevitably would have been discovered during an inventory search." *Cherry*, 920 F.3d at 1140.

We affirm the denial of Haldorson's motion to suppress the evidence seized from his vehicle.

## II. The Apartment Search

We pick up the facts where we left off, with Haldorson at the Plainfield Police Department and the officers' discovery of drugs and explosives in his car.

### A. Background

Officers interviewed Haldorson multiple times the evening of his arrest and carrying over into the early morning hours of the next day, June 24, 2015. The officers read Haldorson his *Miranda* rights on at least two separate occasions over the course of the interviews. After finding pipe bombs in Haldorson's car, the CPAT officers and ATF agents were particularly concerned that Haldorson had stored additional explosive materials at his residence. When officers initially asked him for his current address, Haldorson told the officers that he was homeless. Officer Insley believed that Haldorson lived in downtown Plainfield, and specifically on or around Lockport Street, based on information he had previously gathered

and because officers had seen Haldorson's car parked on that street during the investigation. Haldorson told them that he was dating a woman over there but denied living in the downtown Plainfield area. He eventually claimed that he lived in Joliet at his parents' house and provided an address. Asked if there were any additional explosives at that home, Haldorson responded that there could be.

With this information, CPAT officers and ATF agents left the police station and went to the Joliet address. They arrived at Haldorson's parents' home at approximately 2:45 a.m. on June 24, 2015. Haldorson's parents gave the officers consent to search Haldorson's room, which revealed narcotics-related items but no explosives. After speaking with Haldorson's father, the officers learned that Haldorson did in fact reside at an apartment in downtown Plainfield, on Lockport Street. His father did not know the exact address but gave a general description of the area and Haldorson's apartment. Officers immediately went to that location.

Now on Lockport Street, at approximately four o'clock in the morning, the officers—without a precise address—proceeded to knock on the street-level doors of the buildings (the buildings were retail business on the first floor and apartments on the second), and eventually located and gained access to Haldorson's apartment building.

Once inside the apartment building, the officers knocked on Haldorson's unit's front door. A woman answered the door (and gave the same name as the name of the woman Haldorson said he was dating), who told the officers that Haldorson lived there. She gave the officers consent to enter and search the common areas of the apartment, and even signed a written consent form. Haldorson had a separate bedroom in

the apartment, which was locked. The officers used Haldorson's keys that were taken during his arrest to open his bedroom door. According to the Plainfield police sergeant on the scene, the officers made the decision to enter Haldorson's locked bedroom to search for explosives because they were concerned for the safety of his roommate and the other residents and businesses on Lockport Street if there were, indeed, explosives in the bedroom. The officers did not have a search warrant at the time.

In Haldorson's bedroom officers founds fireworks and explosives. They removed the explosives from the bedroom and secured them in a steel box on ATF trucks. At that moment the officers did not seize anything else from Haldorson's bedroom except for the explosives. In fact, the officers testified that they only conducted a "plain view" search for explosives and then stopped their search. Instead, the officers then applied for and received a search warrant for the apartment. The second search did not produce any additional explosives, but officers did seize narcotics-related items and two laptop computers.

Later that same day, armed with the search warrant, officers also searched two storage lockers that belonged to Haldorson. They did not find any explosives or narcotics in one of the lockers, but seized PVC pipe, multiple low explosive powder canisters, fireworks, and a handgun and ammunition from the second locker.

We break from recounting the facts again to tackle the legality of the bedroom search.

**B. Analysis**

When the police officers entered Haldorson's bedroom and searched it for explosives, they did not have a search warrant or consent. "Warrantless searches and seizures within a home are considered presumptively unreasonable and a violation of the Fourth Amendment." *United States v. Huddleston*, 593 F.3d 596, 600 (7th Cir. 2010). There are, however, "certain narrowly proscribed exceptions." *United States v. Bell*, 500 F.3d 609, 612 (7th Cir. 2007). One such exception is where "exigent circumstances require officers to 'step in to prevent serious injury and restore order.'" *Huddleston*, 593 F.3d at 600 (quoting *Bell*, 500 F.3d at 612). Under the exigent circumstances exception, "a warrantless entry into a dwelling may be lawful when there is a pressing need for the police to enter but no time for them to secure a warrant." *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 557 (7th Cir. 2014). The test is whether "an officer had an objectively 'reasonable belief that there was a compelling need to act and no time to obtain a warrant.'" *Huddleston*, 593 F.3d at 600 (quoting *Bell*, 500 F.3d at 613). The existence of exigent circumstances is a mixed question of fact and law that we review de novo. *Id*. We still review the district court's factual findings for clear error. *United States v. Delgado*, 701 F.3d 1161, 1164 (7th Cir. 2012).

The exigent circumstances exception is "frequently invoked in cases involving explosives." *United States v. Witzlib*, 796 F.3d 799, 802 (7th Cir. 2015) (collecting cases and citing, for example, *United States v. Infante,* 701 F.3d 386, 393–94 (1st Cir. 2012); *Armijo ex rel. Armijo Sanchez v. Peterson,* 601 F.3d 1065, 1071–73 (10th Cir. 2010); *United States v. Lindsey,* 877 F.2d 777, 781–82 (9th Cir. 1989); *United States v. Al–Azzawy,* 784 F.2d 890, 894 (9th Cir. 1985)). Explosives are, by their

very nature, inherently dangerous. Homemade explosive devices even more so because the persons manufacturing them often lack the needed technical knowledge and skills. Therefore, even though Haldorson enjoyed a strong expectation of privacy in his locked bedroom, that expectation must be balanced against the need to protect the public from serious harm where explosive materials may be present in a residential complex with close neighbors. *United States v. Boettger*, 71 F.3d 1410, 1414 (8th Cir. 1995) ("[Privacy] expectations must be lowered where a resident admits working with explosive materials in an apartment complex with close neighbors."); *see Michigan v. Clifford*, 464 U.S. 287, 297 n.8 (1984) (careful "not to suggest that individual expectations of privacy may prevail over interests of public safety").

The following objective facts, found by the district court and not clearly erroneous, were known to the officers before they entered into Haldorson's bedroom: Explosive materials, including pipe bombs, were found in Haldorson's car; pipe bombs, according to the Cook County Sheriff's Police Bomb Squad and ATF agents, are very volatile and dangerous; Haldorson admitted that more explosives could be at his residence; Haldorson falsely told officers that he lived at his parents' house, and a search of that house uncovered no explosives; and Haldorson actually resided at an apartment in downtown Plainfield, which was surrounded by residential neighbors and businesses. Moreover, the district court found that an ATF agent credibly testified that there was a "legitimate concern" that other homemade explosives were "potentially unstable and therefore dangerous to others." Based on these facts, the officers reasonably believed that there was a justifiable and urgent need to act to prevent serious harm.

Because of the acute concern and the hour at which the officers and agents were urgently proceeding, around three and four o'clock in the morning, there was no time to obtain a warrant.

Haldorson relies on the fact that the officers and agents only conducted a plain view search for explosives in his bedroom to question their belief that the explosives posed an immediate threat. But, as the district court noted, law enforcement officers took additional steps consistent with their belief that the explosives posed an immediate threat, including clearing Haldorson's girlfriend from the apartment. Further, contrary to Haldorson's contention that their "true aim and intent" was to conduct a warrantless search, the fact that the officers only did a plain view search shows that the expressed concern was not simply pretext for searching for and gathering evidence of criminal activity. *See Clifford*, 464 U.S. at 292. The search did not exceed the scope of the exigency. *See United States v. Salava*, 978 F.2d 320, 325 (7th Cir. 1992) ("The ensuing search … was appropriately limited to the [exigent] circumstances that justified it.").

Haldorson also emphasizes that he was in custody and therefore "any alleged explosive materials were stable and inert." The opposite is true—homemade pipe bombs, and other improvised explosive devices, are unstable.[5] An ATF agent,

---

[5] It is for this same reason that we find unpersuasive Haldorson's reliance on *United States v. Yengel*, 711 F.3d 392 (4th Cir. 2013), which involved a warrantless search based on the possible threat of a grenade inside a home. Upon learning of the possible existence of a grenade, however, the officer did not call for the assistance of explosive experts, or even "remove the sleeping child from the room located directly next to the room where the 'grenade' was allegedly stored." *Id*. at 395. The officer's "own actions belie[d]" the argument that there were exigent circumstances. *Id*. at 398.

who has experience and expertise with explosives, credibly testified to this below.[6] In short, the officers reasonably believed that the homemade pipe bombs posed an immediate threat to public safety.

Given the facts and information known at the time of the search, "from the perspective of the officers at the scene," *Huddleston*, 593 F.3d at 600, there was a legitimate concern that other homemade explosive devices were in Haldorson's bedroom that were potentially unstable and therefore dangerous to others. The warrantless search fell within the exigent circumstances exception to the Fourth Amendment's warrant requirement.

### III. Constructive Amendment to the Indictment

Back to the facts, and with the pretrial motions and evidentiary issues on appeal taken care of, we turn to Haldorson's objections to the jury instructions.

Haldorson challenges the instructions to the jury on Count Four as a constructive amendment to the indictment. Count

---

The officer acted with no level of urgency. Importantly, and distinct from our circumstances, the Fourth Circuit noted that there was "no indication that there might be *other, more unstable explosives*, inside as well." *Id*. (emphasis added).

[6] *See also Fact Sheet–Illegal Explosive Devices*, Bureau of Alcohol, Tobacco, Firearms and Explosives (May 2019), https://www.atf.gov/resource-center/fact-sheet/fact-sheet-illegal-explosive-devices ("Illegal explosive devices … are typically extremely sensitive to heat, shock, electrostatic discharge and friction that may initiate, unexpectedly causing serious injury or death. The risks associated with these devices are further compounded because the persons manufacturing, transporting and using these devices often do not have the knowledge, skills and experience required for such activities.").

Four of the indictment charged, in pertinent part, that Haldorson "unlawfully carried an explosive, namely, smokeless powder, during the commission of a felony … ." Because the indictment charged him with carrying a specific object— smokeless powder—the jury could only convict if it found beyond a reasonable doubt that Haldorson carried smokeless powder, not just any explosive material. Haldorson argues that the jury instructions on Count Four unconstitutionally broadened the bases of conviction by permitting the jury to convict if they found he carried any explosive. This is a question of law that we review de novo. *United States v. Mitov*, 460 F.3d 901, 906 (7th Cir. 2006).

The Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. amend. V. Only the grand jury can amend the indictment to broaden it. *Stirone v. United States*, 361 U.S. 212, 216 (1960); *United States v. Pierson*, 925 F.3d 913, 919 (7th Cir. 2019). "This rule both enforces the Fifth Amendment and helps to ensure that a defendant is given reasonable notice of the allegations against him so that he may best prepare a defense." *Pierson*, 925 F.3d at 919. A constructive amendment "occurs when either the government (usually during its presentation of evidence and/or its argument), the court (usually through its instructions to the jury), or both, broadens the possible bases for conviction beyond those presented by the grand jury." *United States v. Cusimano*, 148 F.3d 824, 829 (7th Cir. 1998).

The statute under which Haldorson was charged, 18 U.S.C. § 844(h)(2), does not require a specific type of explosive as an element—it criminalizes "carr[ying] an explosive during the commission of any felony" (subject only to the

definition of "explosive" in 18 U.S.C. § 841(d)). But the government narrowed the charge against Haldorson by including the specific language "namely, smokeless powder" in the indictment. "Specific language in an indictment that provides detail beyond the general elements of the crime makes the specified detail essential to the charged crime and must, therefore, be proven beyond a reasonable doubt." *Pierson*, 925 F.3d at 920.

The district court instructed the jury on Count Four as follows:

> In order for you to find the defendant guilty of the charge of carrying an explosive during the commission of a felony as alleged in Count Four, the government must prove both of the following elements beyond a reasonable doubt:
>
> …
>
> 2. The defendant knowingly carried an explosive, namely, smokeless powder, during the commission of that crime [in element 1 of the instruction] … .

The jury instruction also included the specific language "namely, smokeless powder." It was added during the final jury instructions conference at the insistence of Haldorson.

The jury instruction for Count Four and Count Four of the indictment both included the identical specific language regarding smokeless powder. The instruction thus required the jury to find, beyond a reasonable doubt, that Haldorson knowingly carried an explosive and that that explosive was smokeless powder, just as Count Four charged.

This is unlike our decisions in *Pierson* and *Leichtnam*, which Haldorson attempts to rely on for support. In both cases, the indictment narrowed the bases of conviction by naming a particular firearm that the defendant was charged with. *Pierson*, 925 F.3d at 920; *United States v. Leichtnam*, 948 F.2d 370, 374 (7th Cir. 1991). And in both cases, the corresponding jury instruction failed to specify the exact gun charged, while at the same time evidence of additional non-indicted guns were presented at trial. "[T]his combination of the evidence and untailored jury instructions added up to a constructive amendment." *Pierson*, 925 F.3d at 920. This is not our case. The jury instruction was tailored to the specifics of the indictment and did not permit the jury to convict Haldorson based on non-indicted explosives. No constructive amendment of the indictment occurred.

Finally, Haldorson makes a passing suggestion that there is "another independent problem" with the jury instructions on Count Four: the instruction contained "vastly more language" than the elements of the offense. According to Haldorson, the language was unnecessary, irrelevant, and suggestive of the facts in evidence.

On a challenge to a jury instruction, our review is twofold. First, "we review de novo whether the jury instructions accurately summarize the law, but give the district court substantial discretion to formulate the instructions provided that the instructions represent a complete and correct statement of the law." *United States v. Bonin*, 932 F.3d 523, 537–38 (7th Cir. 2019). If the instruction is legally accurate, in the second step we then "review the district court's phrasing of the instructions for abuse of discretion." *Id*.

The district court further instructed the jury that:

> The explosive does not have to be related to the
> other crime. A person carries an explosive if he
> knowingly transports it on his person or in a ve-
> hicle or container. A person may carry an explo-
> sive even if it is not immediately accessible be-
> cause it is in another area of a vehicle. The term
> "during" means at any point within the conduct
> charged in Count Two and Count Three.

The first and fourth sentences accurately summarize the ap-
plicable law and Supreme Court precedent. In *Ressam*, the
Court held that 18 U.S.C. § 844(h)(2) does not require a rela-
tionship between the explosive carried and the underlying fel-
ony, and that "during" denotes a straightforward temporal
link. *United States v. Ressam*, 553 U.S. 272, 274 (2008).

The second and third sentences above are strictly defini-
tional. There is no suggestion that they are incorrect, misstate-
ments, or could not have alternatively been included in the
separate "Definitions" instruction that the court provided to
the jurors. Because the instruction on Count Four accurately
stated the law, it was not an abuse of discretion to provide the
additional language to the jury.

### IV. Mistakes During the Police Investigation

As a last resort, Haldorson asks this court to vacate his
convictions because the convictions are "plagued by con-
cealed material information, false and misleading reports,
perjured testimony, an unlawful recording, scant evidence,
contaminated evidence, [and] evidence disappearing from
the evidence vault." The crux of his argument on appeal is
that the cumulative effects of the perceived mistakes and

violations during the investigation deprived him of his Fifth and Sixth Amendment rights to a fair trial.[7]

The problem for Haldorson is that all of the asserted errors he claims infected his trial were known to him before trial and he made extensive use of them at trial on cross-examination. Each and every misstep that the officers and the federal agents allegedly made along the way came out at trial. In fact, in closing arguments, Haldorson essentially argued to the jury what he now argues on appeal.

Much of Haldorson's argument can be disposed of with that, but we conclude with a brief comment on one of the specific allegations concerning irregularities with Officer Insley's handling of the confidential informant. The primary issue is that Officer Insley did not disclose the informant's arrest that occurred ten days before the controlled buy to his police supervisors or to the prosecutors. A confidential informant's personal and criminal history is material information and is often critical to different stages of an investigation or prosecution. When the police seek a search warrant based in part on an informant, for example, the omission of adverse information may impair the neutral role of the magistrate deciding whether to issue the warrant. *E.g.*, *United States v. Glover*, 755 F.3d 811, 817 (7th Cir. 2014). Similarly, the government

---

[7] Importantly, although his argument is framed similarly, Haldorson's argument is not one of cumulative error because he does not allege that any errors were committed in the course of the trial. *See United States v. Marchan*, 935 F.3d 540, 549 (7th Cir. 2019) ("To establish cumulative error a defendant must show that (1) at least two errors were committed in the course of the trial; [and] (2) considered together along with the entire record, the multiple errors so infected the jury's deliberation that they denied the petitioner a fundamentally fair trial.").

would have to disclose that same adverse information to the defense as exculpatory material under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). In this particular case, Officer Insley's lack of disclosure did not taint any later stages of the investigation or prosecution. No warrants, evidence, or testimony relied on the informant's credibility.

Mistakes were made during the police investigation of Haldorson. The government readily concedes as much. But those mistakes did not deprive Haldorson of his constitutional rights. Haldorson had a full and complete opportunity to defend himself against the government's charges and received a fair trial.

AFFIRMED.